The Honorable Steve Faris State Senator 29476 Highway 67 Malvern, AR 72104-6833
Dear Senator Faris:
I am writing in response to your request for my opinion on the following questions:
 1. Do provisions of the Arkansas Patient Protection Act, or any other statutory scheme, give the Arkansas Insurance Department ("AID") the means or method to verify that insurers are paying providers in a nondiscriminatory manner?
 2. If such tools are available to the AID, are there any penalties that could be imposed on those insurers who may be violating the provisions of the Act?
 3. Does the Patient Protection Act, or any other statutory scheme, give the AID the means or method to require that insurance companies report their payment rates for selected inpatient DRG's[1] and outpatient procedures or codes directly to the AID?
You report that you have posed these questions in the wake of complaints by some of your constituents "that even though the act requires the health care insurer to 'apply such terms and conditions in a nondiscriminatory manner,' payment rates are not equal among providers equally situated." You further report that the AID "has stated publicly that they do not have the means or the method to 'verify' that providers are being paid in a nondiscriminatory manner."
RESPONSE
In my opinion, the answer to your first question is "yes."See A.C.A. §§ 23-99-201 through-209; 23-99-801 through-803; 23-61-108. With respect to your second question, the Code contains various penalty provisions that might apply in the case of a non-compliant health care insurer. See discussion, infra. As suggested in my response to your first question, I believe the answer to your third question is also "yes."
Question 1: Do provisions of the Arkansas Patient Protection Act, orany other statutory scheme, give the Arkansas Insurance Department("AID") the means or method to verify that insurers are paying providersin a nondiscriminatory manner?
In my opinion, the answer to this question is "yes."
As you suggest in your statement of background facts, the Arkansas Patient Protection Act of 1995 (the "Act"), codified at A.C.A. §§23-99-201 through-209 (Repl. 2004 Supp. 2005), known as the "Any Willing Provider Law," see AID Rule 86, Section 1, mandates that managed care networks allow any willing health care provider to participate in managed care programs on equal terms with other participating health care providers.[2] See A.C.A. §§ 23-99-801(a)(2) and-802(1) (Supp. 2005). The procedures and remedies to enforce compliance with the Act are set forth in title 23, chapter 9, subchapter 8 of the Code. Specifically with respect to the AID's role in enforcement, A.C.A. § 23-99-803 (Supp. 2005) provides:
The Insurance Commissioner shall:
 (1) Enforce the state's any willing provider laws using powers granted to the commissioner in the Arkansas Insurance Code; and
 (2) Be entitled to seek an injunction against a health insurer in a court of competent jurisdiction.
The referenced Arkansas Insurance Code is codified at A.C.A. § 23-60-101et seq. (Repl. 2001 Supp. 2005). The insurance commissioner's powers are set forth at A.C.A. § 23-61-103. Subsection (d)(1) provides in pertinent part:
 The commissioner may conduct such examinations and investigations of insurance matters, in addition to examinations and investigations expressly authorized, as he or she may deem proper to determine whether any person has violated any provision of the Arkansas Insurance Code or to secure information useful in the lawful administration of any such provision.
Section 23-76-122 (Repl. 2004) further authorizes the commissioner to examine the affairs of any health maintenance organization "as often as he or she deems it necessary for the protection of the interests of the people of this state but not less frequently than one (1) time every three (3) years."
In my opinion, these statutes read together clearly invest the commissioner with the authority to promulgate regulations requiring a health care insurer as defined at A.C.A. § 23-99-203(f) (Supp. 2005) to provide documentation that will enable the commissioner to determine whether similarly situated health care providers have been subjected to discriminatory policies. See A.C.A. § 23-61-108 (Repl. 2001) (authorizing the commissioner to adopt reasonable rules and regulations "necessary for or as an aid to the effectuation" of any provision that the commissioner is charged with enforcing). To date, the commissioner has not yet promulgated any such regulations.
Question 2: If such tools are available to the AID, are there anypenalties that could be imposed on those insurers who may be violatingthe provisions of the Act?
As noted in my response to your first question, A.C.A. § 23-99-803
authorizes the commissioner to seek injunctive relief against a non-complying health care insurer. Accord A.C.A. § 23-61-110(a)(1)(A) (Supp. 2005) (authorizing the commissioner to "institute such suits or other legal proceedings as may be required for enforcement of any provisions of the Arkansas Insurance Code"). Section 23-76-122 of the Code (Repl. 2004) authorizes the commissioner to conduct examinations of health maintenance organizations at his discretion and at least every three years. Section 23-76-123 (Repl. 2004) authorizes the commissioner to suspend or revoke the certificate of authority of any health maintenance organization under specified conditions. Among these conditions are the following:
 (1) The health maintenance organization is operating in contravention of its basic organizational document, its health care plan, or in a manner contrary to that described in and reasonably inferred from any other information submitted under § 23-76-107,[3] unless amendments to the submissions have been filed with and approved by the commissioner;
 (2) The health maintenance organization issues evidence of coverage or uses a schedule of charges for health care services which do not comply with the requirements of § 23-76-112[4];
 * * * (9) The continued operation of the health maintenance organization would be hazardous to its enrollees[.]
Section 23-66-210 of the Code (Supp. 2005) further authorizes the commissioner, following a hearing observing procedures set forth at A.C.A. § 23-66-109 (Supp. 2005), to declare that a health care insurer has engaged in a pattern of unfair competition or deceptive trade practices. Subsection 23-66-210(a)(1) authorizes the commissioner to impose significant monetary penalties for each violation. Subject to a right of judicial review, A.C.A. § 23-66-210(a)(2) further authorizes the commissioner to suspend or revoke the license of a health care insurer if the insurer knew or reasonably should have known that its conduct was unlawful.
Question 3: Does the Patient Protection Act, or any other statutoryscheme, give the AID the means or method to require that insurancecompanies report their payment rates for selected inpatient DRG's andoutpatient procedures or codes directly to the AID?
In my opinion, the answer to this question is "yes." See my response to your first question.
Assistant Attorney General Jack Druff prepared the foregoing opinion, which I hereby approve.
Sincerely,
DUSTIN McDANIEL Attorney General
[1] Pursuant to Section 1886(d) of the Social Security Act, the acronym "DRG" designates a "diagnosis-related group," which is assigned a payment weight based upon the average resources devoted to treating Medicare patients within that group. For a summary of how this designation factors into the compensation formula, see www.hhs.gov.
[2] Subsection 23-99-802(1) of the Code (Supp. 2005) defines the term "any willing provider law" as follows:
 "Any willing provider law" means a law that prohibits discrimination against a provider willing to meet the terms and conditions for participation established by a health insurer or that otherwise precludes an insurer from prohibiting or limiting participation by a provider who is willing to accept a health insurer's terms and conditions for participation in the provision of services through a health benefit plan[.]
[3] Section 23-76-107 of the Code (Repl. 2004) sets forth the requirements an applicant must meet before the commissioner will issue a certificate of authority to operate as a health maintenance organization.
[4] Section 23-76-112 (Repl. 2004) sets forth the information to be included in the evidence-of-coverage form a health care insurer is obliged to provide enrollees and the commissioner. *Page 1